Good morning, counsel. Good morning. May it please the court, Brendan Algarve Stoll Reeves, on behalf of Dr. Mary Cullinan, I'd like to reserve five minutes, please. As a public university president, Dr. Mary Cullinan was a steward of public assets. When a university faced an unprecedented situation that put millions of dollars of public assets at risk, she had to act. Dr. Cullinan acted in the most reasonable and competent manner and is exactly who the Qualified Community Doctrine exists to protect. The district court had no basis to strip her of that protection. First, the record does not establish a constitutional violation. There is no stigmatizing statement. Dr. Cullinan never referred to Plaintiff as a liar or questioned his morals, let alone a stigmatizing statement made in the course of his no-cause, non-renewal of employment with the university. Second, even if this court should disagree and conclude Dr. Cullinan had infringed on Plaintiff's liberty and interest, the parameters of this right, both with respect to the stigma element and the in the course of element, are not clearly established, such that Dr. Cullinan would have known that her actions with respect to Plaintiff would have been unlawful. As this court is well aware, the Qualified Immunity Doctrine serves to shield public officials like Dr. Cullinan so that they may carry out their duties without being harassed or distracted or, in this case, held in the court, unless they have acted in a plainly incompetent manner or they have acted unlawfully. Dr. Cullinan is neither incompetent nor did she know any violate clearly established law with respect to Plaintiff's 14th Amendment, Liberty and Justice. Counsel, may I ask you, is it fair to impute the Miller-Nass letter to your client? I don't know that it's fair, Your Honor, but I think clearly case law. I don't know that we had a facial argument to bring to you that the court should not. She did not authorize, but she did not author the letter. This is a really unique situation where we have an urgent situation. And what does Dr. Cullinan do? She goes to University Council. Is it fair to assume that she authorized the letter? She asked for the letter? The testimony in the record, Judge Kishina, is yes, that she started the chain of motion, if you will, to University Council. She went to outside counsel, and ultimately she was someone who reviewed the letter before it was finalized on March 22nd, and that's exactly what she shouldn't have done or lied on. All right, that's it. You showed us your content. The question is, I think, from that, is it fair to impute that? Yes. Was there a letter? And then she publicized it at a meeting, right? Well, I don't think it was her letter. I think it's a letter from lawyers to lawyers of the foundation board, and with respect to the publication, all Dr. Cullinan did was raise the letter to the board, and her statement that she read to the board is in the record, and I encourage the court to look at it because it says nothing about the potential legal things outlined in the letter. It says nothing about Mr. Kramer's employment or what will happen with the renewal. But wasn't the letter written on her behalf? No, the letter was written on behalf of the university, on behalf of the public. And her investigation. The letter would not have been written had she not started the process that culminated in the letter. That's probably fair with the record before this court, yes. So let's look at the letter, right? That's an initial question, but that certainly doesn't get the court to the analysis we need to go through. It's as far as the analysis? It's just the analysis. It's just the analysis. But when you look at the letter, what is that letter? That letter is nothing more than a reservation of rights for the university to alert the foundation board if you move forward. Well, the usual threatening letter that you send to the other side, stuff like from which you can imply, for instance, that, well, Kramer is probably not entitled, in that case, you receive your tankent and then you're condemned to file for a fraud. Right? You can infer from that that there's a charge of fraud involved. I would disagree with that, Judge Tachima. If you look at the language, and it's on the last page of the learner's letter, and I think the letter starts at 188 in the record, what that's referring to is the lawyer's opinion, if you will, of a contract provision that exists within the foundation's bylaws that speaks to the entity. And the general opinion. No, no, no. I think he's translating it. Well, I haven't seen your D&O policies, but most policies are, you know, so-and-so, right? That is correct. There are two places in the Learner's Letter where there is a comment about fraud, and it lives within the what are typical exclusions for D&O policies. I haven't seen yours, but. I mean, why would he mention that? Why would he mention that? Except, you know, people can draw the inference that, well, there's a fraud charge involved here. There's absolutely no fraud charge. I think the letter states. There isn't. You can infer that directly. In other words, there isn't a fair inference to say, well, I can't decide just on the basis of the letter, you know, that your client's entitled to summary judgment on the basis of qualified immunity because, you know, this could be read as sympathizing. I don't disagree with that. I think it's absolutely appropriate for this court to decide the legal question of whether or not Dr. Cullinan is entitled to qualified immunity. First, there is no charge of fraud in that letter. We need to be really clear what the letter says. The question is, can it be inferred? And is it proper to infer something like that in this context of qualified immunity? It's not proper to infer that. What's proper is to look at the particularized context of the situation. And if you look at what was going on with respect to Mr. Kramer's employment and what Dr. Cullinan is saying or not saying, it's the exact opposite. Yes, ma'am. When we're determining qualified immunity, don't we get the facts in the light most favorable to the plaintiff? Yes, on summary judgment. That's correct. Exactly. So if we were to take the facts in the light most favorable to the plaintiff, wouldn't that result in inference that there was an allocation of fraud? Again, I disagree with you on that, Your Honor. I don't think the inference can be drawn. And then let's take it from there. Even if the court decides to draw that inference, which we disagree, that's what the letter says. And if you look at what is going on in private and in public, the university is saying this is all stemming from a structural conflict of interest between the foundation and the university. What does the university spokesperson say in the first article that's published on March 24th or 25th the day after? We don't blame Mr. Kramer for this conflict of interest created by his dual role. He's been doing his job. We don't blame him. There's absolutely no accusation that could be in the public eye that would make that connection. So even if the court is questioning that, it should move on in its analysis. Well, the Kramer letter said that the university could pursue claims directly against Ron Kramer. So that doesn't indicate that the university is refraining from attributing any liability to him. But that does lay out potential individual claims that it may pursue if the resolutions are passed. They are never passed. The foundation and the university are ultimately able to mediate their structural and governance issues privately and amicably. There is no case, even if it's not brought one before this court, nor are we aware of one, that a public university laying out potential legal claims that it may have to bring stigmatizes the public employee. There is absolutely no case that would have put Dr. Kramer on notice. And frankly, what was she to do? Was she to do nothing? That was not an option. Could she have gone immediately to court rather than send this letter? Well, maybe. And then she may have protected him. She could have sent a letter that didn't contain any language that could be considered stigmatizing against the individual. And it's our position that that letter does not contain any language. So I disagree with you that there is stigmatizing information in this letter. Where do we go from here? So we go to the clearly established point, Your Honor. Well, first it has to be stigmatizing within the course of this termination. But ultimately, ultimately, whether it's clearly established that this is a stigma, what cases may have come forward with that would have put Dr. Cullinan on notice that making comments about potential claims for breach of fiduciary duty, potential claims that he was not acting in the best interest of the university, what's listed in the NARA National Register, five potential claims against him, that that would somehow infringe his liberty interest and that that played out in the public eye. And what we know is what's going on privately with respect to his employment has nothing to do with that Miller-Nash letter. The reason why he was not renewed was because the university knew from the audit report that it had to make a change by June 30th. And Dr. Cullinan committed that that had to happen. And this is coming up on that deadline. So we know he's offered the ability to resign from his position with the university. And she wants an amicable resolution. If you look in the record, her comments to plaintiffs, about plaintiffs, are positive with respect to his contributions. There's absolutely nothing stigmatizing the letter. It existed solely to respond to these potential legal threats and movement of millions of dollars of assets. But turning to what she and the university did with respect to his employment was all private, and neither this court nor the Supreme Court has ever looked at those private communications to support a liberty interest, nor should it. Well, what about the fact that all of this played out in the local media? How is that private? Well, I think it doesn't get you there. It's easy for the plaintiffs to weigh that in front of this court. Look at all these articles. The public knew about it. But that really doesn't get to the analysis of in the course of his termination, which on their own right to campaignarily, this court has looked at what's been in the public eye. If Kramer's making statements to the public, the foundation is making statements to the public, and what the record supports is nowhere, nowhere is there any statement made in the public eye by Dr. Coleman or frankly by the university that impugns plaintiffs' reputation for honesty or morality. And that's the bar, right? It may matter if statements are made to the public, if those statements are otherwise entering the public domain, going to public meetings or documents that are accessible to the public. I think it needs to be more than just a document accessible. If you read the first part, in Cox v. Ross Kelly, the fact that these different types of information was put into a personnel file that could be accessed through a public records request was enough. And I'm aware of that case, Judge. I think both of you opined on that case. The difference in Cox is it's a Washington State case, and there was a specific Washington statute that made a public or a personnel record a public document. But the point is that if the information is available to the public, then it has entered the public arena. It's no longer private. And so if the matter was aired at a public meeting or the press had access to it, then it's no longer private. I agree with that, Matt. But where is the connection to discrimination? Where is the Miller-Nash letter connected to discrimination? That's where there is no causal nexus. Unless the court has further questions, I'll reserve my time. Thank you. Good morning. May it please the Court and Counsel, Christy Moore on behalf of Plaintiff Appellee Ronald Kramer. I think the judges today, you've exactly hit on the head what I was going to first introduce to this court, and that is an incessant where their defendant's conduct violated a constitutional right. This court must view the evidence in the light most favorable to plaintiffs. Although a defendant acknowledges that standard, she fails to apply it or even recognize that whether a statement is stigmatizing is a question of fact. Let's get to that point right now. What is the best case you can cite to us that supports your position that whatever came out of this letter, the letter itself and the comments made, was stigmatized to your client in the 14th Amendment sense? What's your best case? Well, I believe there are several cases, actually. What's your best? Well, I would say Cox and I would say Tibbetts are the two best cases. I think Tibbetts is the best case because although the court did not decide as a matter of law whether the statements were stigmatizing, the court did definitively say that comments about ethics, accountability, we now have a new, open, honest administration. Those type of comments are more analogous to honesty and morality versus incompetency. And Cox, I think, also is more beneficial here because in that situation, which you all know since you authored the opinion, is that the individual was basically being charged with fraud. He worked for the government. He was sending individuals over to an auto body store that was overcharging those individuals. Do you hear there was really no charge of fraud? I would disagree. That you can attribute to the president of the university? That you can attribute to the president? I disagree. I think, first of all, as we were talking about earlier, the president did admit in testimony, which is part of this record, that she authorized and approved the final letter going forward. That's on supplemental excerpt record 28. Correct. She also admitted that she was the one that published it at a public meeting in which the news media was in attendance. There were piles of the letter there. She specifically said she wanted everybody there to look at the letter. So I think that's sufficient publication, and she's taking ownership of it. In the Miller-Mash letter, in your view, was stigmatized? I think there are several things that are stigmatizing, but the strongest, which I will address right now, is the fact that it says, and this is on ER 192, it seems unlikely to us that there would be any insurance protection for Mr. Kramer in this matter. This is one of the records. Correct. I apologize. I'm just pointing to him directly, but it says directors, which is referring to Mr. Kramer. Firstly, some insurance policies typically exclude coverage for intentional acts, waste, or fraud. The jury can easily infer that they are charging him with fraud in this instance. The next strongest argument is, nor do we see a clear path to indemnity. Exactly as Judge Panner found below, that would lead a jury to believe that there is no clear path for him because he has engaged in bad faith or willful misconduct. If any actions are determined to have been made in bad faith or through willful misconduct, so it's conditioned, how is that stigmatizing? I think you also have to take into mind the first sentence that says, nor do we see a clear path to indemnity, and those kind of contradict one another. One makes it sound like definitively, the other makes it sound more contingent, but in addition to that, even if it is of a contingent nature, it's just like other cases where, for instance, I hope I'm not mispronouncing the case, I believe it was Guzman, and he was charged with fraud in regard to saying that these devices were FDA approved. He was charged. He hadn't actually been found convicted of it, and so I think that's similar here where you have an individual who's, in essence, it's being implied that he did it. It creates an impression that he did something wrong. And there's another thing I think you should notice in this letter. On ER-190, when they're listing the potential claims they could bring against the foundation, they say, if the resolutions are adopted, the university would consider. But yet, when you get to Mr. Kramer on 191, it says, the university can make claims against Mr. Kramer and seek to hold him personally liable, and there's no mention of could if the resolution is passed. And it goes on to say, breach of fiduciary duties to his employer, and I think that's exactly the type of ethics that's referred to by this court in the Tibbetts case. You also go on to say, interference or conflict. You're saying the charge of breach of fiduciary duties is a stigmatizing charge? I think it can be inferred to be yes by the jury. When you look at in context with the rest of these statements, and you also have to consider, too, which I repeated quite a bit in my brief, you can't bring a lawsuit against an employee if they're incompetent. You bring a lawsuit against somebody if they're fraudulent, if they're interfering with contract, doing these, what you would normally infer to be bad, bad faith conduct. And also, what case do you have to support the proposition that accusing someone of breach of fiduciary duty constitutes stigmatizing information? Is there a case that we can look to to support that argument? I have found I do not have a case before him, but I would say that's pretty similar to Tibbetts when they talk about ethical conduct. To me, breaching your fiduciary duty is an ethical accusation. So in the context of qualified immunity, do you think that Tibbetts' case would have been sufficient to put Dr. Cullinan on notice that this would be a constitutional violation if that charge were made? I think that, well, again, the breach of fiduciary duty is not the only charge here. There's also the fraudulent charges. What fraudulent charges? Where they imply that he has committed fraud and he's not being identified. And then they also imply that he's been engaged in bad faith and misconduct. And, again, these are questions of fact, and I think it's sufficient here that a jury could infer that it creates this impression. Well, the issue is whether or not it's clear or it would have been clear. Okay. So to oppress infantes would be stigmatizing charges. Correct. So let's move on to that part of the analysis. And I'd like to point out I think what the defendant does in her arguments is exactly what the Supreme Court said not to do in Toll and Begotten. And she imports genuine factual disputes into the clearly established analysis. I think the right violated here today, and which is a particularized right, is that he has 14th Amendment of what was violated when the defendant published a charge impugning his honesty and morality as opposed to allegations of incompetence the day before terminating his employment. I think that defendant has defined it. There's too much particularity here. What's the question of, don't you think, whether or not the charges we hear amount to charges of what's called honesty and morality? It seems to me that what's the effect? I mean, I don't think the judge can decide that. So saying a letter that says, well, you may not be entitled to indemnification is per se a stigmatizing charge, isn't it? No, I don't think so. I think it is a question of fact for the jury, and this court in Campanelli specifically said. Well, here's the next question, although you say this is not the right way to go. If it's a question of fact, and we don't know exactly what it is, how can you say that just in this context? It's clearly established that it's stigmatizing. Well, if you look at this court's prior case law, for instance, in Cox, in Cox this court said it's clear that this impugns honesty and morality. This court didn't look to other cases to see if that was, in fact, true. Instead, what you look to see is what a reasonable official understand in the circumstances of this case, what they were doing violated a constitutional right. And I think here she would. The facts were more extreme in Cox. I mean, it was clear what the allegation was that was made against the court. But I think you first look to see what the right is violated, and here I think the right that a jury could infer that it impugns honesty and morality, and then I think going forward you look to see what cases establish that. And I think that Tibbetts, Cox, Stratton, Guzmar, G-U-Z-M-A-R, is particularly applicable. I think all of those would put her on sufficient notice. And, you know, one thing I'd like to notice is that to discuss is defendant argues that she acted reasonably in the particular circumstance space because there was the potential that plaintiff was going to take away millions of dollars in assets. And I really ask the court to look carefully at the record here because there are several instances where defendant gets it wrong and, again, reports factual disputes into her analysis. Defendant was the one who chose to publish this letter. She didn't have to publish it. She could have kept it quiet. Instead, she published what she called a pretty threatening letter, and it was her that chose to terminate him the next day. That termination was also published by defendant. Defendant was the one who in late February told President JPR she was going to fire a plaintiff. It was also SOU employees who turned around and told the foundation that they were going to fire a plaintiff. So they were the ones who first introduced it to the public. I also think it's notable that she had other options. For instance, they had just a few days prior threatened to freeze the assets so that JPRF could not access them. That's under ER 55. Why didn't they simply do that? In addition, they could have done this. Instead of writing the threatening letter, they could have done it privately. And what the resolution was is that they were going to go to the legislature and try to get the legislature to move the assets to them, which is something that's going to take months. So this wasn't a quick circumstance that she had to do what she could in a few moments. So opposing counsel takes issue with the fact that this letter was written in conjunction with the termination. What's your response to that? I think that the jury could easily infer that this letter was done the day before termination and that it was, therefore, in the course of termination. And the reason for that is that the record shows the defendant herself thought it was a termination. She testified to that. I don't understand what you mean when you say the defendant thought it was a termination. So what the defendant is arguing is that the March 23rd letter was just notification of termination, and then later it turned out it was an appropriate notification and there was a grievance. But what I would say is the record establishes she thought she was terminating him on March 23rd. Yeah, and, in fact, there's plenty of the records she testified to that. There's also an inner SOU memo in which they noted he was terminated in late March. You also have the newspaper article in which the SOU employee stated he was terminated. But still, what's the organization? So you have the timing, culture, but certainly what's the connection? You know, they didn't stand in any ground to allow him to do his contract, right? Oh, no, no, no. What's the connection between this letter and that one? Well, when you have a day, just a day, you publish this letter, and the next day you fire him, I think that it's under Campanelli. It's not so tenuous the public would then assume that he was terminated. Does the fact that the temporal nexus is sufficient alone to show that it was sort of what's the requirement? You can't say, well, there's a relation in the course of the termination. Correct, I do. And I think Campanelli, which was seven to nine days, gives her it's clearly established that one day is sufficient. And, again, I want to, because it seems that this court is more focused on the clearly established, but I would like to emphasize that I think any reasonable official would realize that what they are alleging in the Miller-Nash letter is sufficiently stigmatizing, and that those other cases do give her sufficient notice. The defendant is asking for too much particularity here, which is not required in this case. We're not asking for a general constitutional right. Instead, we've particularized it within the context of what happened here. If the court has no other questions, I'm thinking we can follow. So, no questions. Thank you. A couple points. It absolutely is imperative that this court look at the clearly established prong. That's a matter of law. That's where this case ultimately will be decided if the court gets to that point. And this is where the district court erred. The district court took far too generalized of an approach and, in fact, conflated the two prongs of the qualified immunity analysis together. After he found the letter could constitute a stigmatizing statement, he said, therefore, I assume it's clearly established that it's an apparent error. We've brought to the court's attention the recent U.S. Supreme Court decision on White v. Cali and this court's recent decision in the city of San Diego. There is no case. You ask counsel for a case. She doesn't have one. There was no case to put Dr. Cullinan on notice that the actions she took in March of 2012 would violate plaintiff's liberty interests. The best cases they cite, cops. Cops, as Judge Wellenson said, is not this case. And cops, he was accused of lying. He was accused of deceptive practices, including with his friends who worked at the auto body shop. They want this case to be cops, and they go so far as to quote liar and quote T in their brief. Dr. Cullinan never called Mr. Kramer a liar or a T. Similarly, in Tibbetts, this court never reached a question as to whether or not the statements in the press about Mr. Tibbetts, what lies to that bar. The court never reached that question. These cases are insufficient. Again, plaintiffs admit that they don't have a case. They admit that they're not aware of where these sorts of statements at issue have not been previously held to be unlawful. We ask that this court reverse the decision of the district court. Remand this case so that Dr. Cullinan receives the qualified immunity to which she is entitled. Thank you. Thank you. Thank you to both counsel for your helpful arguments in this case. The cases are to be submitted for decision by the court.
judges: Tashima, Gould, Rawlinson